## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cr-20116-MSN-tmp |
| | ) | |
| MICHAEL SHANE RODGERS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is Defendant Michael Shane Rodgers's Motion to Suppress, filed September 2, 2020. (ECF Nos. 101 & 102.) The government filed a response on September 11, 2020. (ECF No. 103.) For the reasons below, the undersigned recommends that the Motion to Suppress be denied.

### I.    PROPOSED FINDINGS OF FACT

At the suppression hearing, the court heard from two witnesses for the government, Special Agent Elizabeth White of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and Investigator James Jones of the Lauderdale County Sheriff's Office. Defendant Michael Shane Rodgers testified in support of his motion. The court received into evidence ten exhibits, including photographs of the evidence seized from Rodgers's residence; audio recordings of two interviews of Rodgers conducted

by Agent White; a probation order entered against Rodgers; an Advice of Rights and Waiver form signed by Rodgers; and a Consent to Search form signed by Rodgers. (ECF No. 114.) To the extent that the testimonies conflict, the court finds Agent White and Inspector Jones's testimony to be more credible than the testimony of Rodgers.

Rodgers was placed on probation on April 11, 2017, following a conviction for possession of a controlled substance and for domestic violence assault. His probation was set to last until April 12, 2019. As a condition of his probation, Rodgers agreed "to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time." (ECF No. 114, ex. 3.) Rodgers listed his address on the probation order as 112 Halliburton Street.[1] (Id.) However, during his probation, Rodgers also lived part-time at 2267 Curve Nankipoo Road in Ripley, Tennessee.[2]

On August 6, 2018, Agent White received a tip that Rodgers was growing marijuana at the 2267 Curve Nankipoo residence and in

---

[1]This is Rodgers's mother's home.

[2]Rodgers testified that he had lived at the 2267 Curve Nankipoo Road residence with his girlfriend until May 2018. Rodgers's nephew, Jonathan Mashburn, lived at the residence in August 2018, but Rodgers still kept some of his clothing and furniture at the residence. The residence was leased by Rodgers's girlfriend and he had the authority to allow other people to stay there, such as Mashburn.

possession of a gun while on probation. Agent White contacted Rodgers's probation officer to validate the tip and review his probation order. Three days later, White, fellow ATF Agent Ryan Todd, and Lauderdale County Sheriff's Office Investigators James Jones, David Owen, and Micah Middlebrook went to 2267 Curve Nankipoo Road to speak with Rodgers. The house was accessible by a narrow gravel driveway. The police officers parked their cars in the driveway.[3] Investigator Jones was the first person to exit his vehicle, followed closely behind by the other two investigators. A dog ran up to the officers and barked loudly. Investigator Middlebrook, who was afraid of dogs, unholstered his taser.[4] Hearing a commotion, Rodgers came outside through the front door of the house with his hands up. Rodgers called out to the dog and placed him in a kennel. Investigator Middlebrook holstered his taser once the dog was placed in the kennel.

When Rodgers returned, Investigator Jones told him the officers were responding to a tip that he was growing marijuana on the property and that he had a gun. Rodgers, who had been arrested by Investigator Jones for growing marijuana in 2011, responded by

---

[3]While the testimony was unclear as to the number of cars, both Rodgers and Investigator Jones agreed that the police officers arrived in three or four cars.

[4]Rodgers testified that, from inside his house, he saw three officers pointing their guns at his dog. In light of the testimony of Investigator Jones and Agent White, the undersigned submits that this testimony is not credible.

saying that he was "doing the same thing as last time." Rodgers
also told Investigator Jones where some of the marijuana plants
were growing around the property. The conversation lasted less
than two minutes. When it was over, the other investigators entered
the house while Investigator Jones introduced Rodgers to Agent
White.

Agent White first asked Rodgers if he was on probation and
then told him that she wanted to read him his <u>Miranda</u> rights before
speaking with him. She provided him with a copy of an ATF Advice
of Rights and Waiver Form, which Rodgers signed.[5] The Advice of
Rights and Waiver form was signed at 12:18 p.m. and read:

> You have the right to remain silent. Anything you say
> can be used against you in court. You have the right to
> talk to a lawyer before we ask you any questions and to
> have a lawyer with you during questioning. If you cannot
> afford a lawyer, one will be appointed for you if you
> wish before any questioning begins. If you decide to

---

[5]Agent White testified at a bond hearing on October 29, 2020, that
Rodgers did not sign the Advice of Rights and Waiver form until
they had arrived at the Lauderdale County Sheriff's Office
("Justice Center"). (ECF No. 42, at 20 ¶¶ 9-12.) However, she
further testified that, at the time of the bond hearing, she did
not remember when the waiver form was signed. (<u>Id.</u>, at 21 ¶¶ 5-
9.) She testified that she based her answer on the time stamp on
the form, which she believed correlated with when they were back
at the Justice Center. (<u>Id.</u>, at 21 ¶¶ 5-9.) After reviewing the
time stamp on the Consent to Search form, which she was "sure" was
signed at the scene, Agent White testified that the waiver form
must have been signed first. (<u>Id.</u>, at 21 ¶¶ 10-16.) At the
suppression hearing, Agent White reaffirmed that the Advice of
Rights form was signed at the residence and that it was signed
first. The undersigned finds that Rodgers signed the Advice of
Rights and Waiver form at the residence shortly before signing the
Consent to Search form.

answer any questions now without a lawyer present, you
have the right to stop answering at any time.

Waiver: I have read this statement, or had it read to
me, and I understand these rights. At this time[,] I am
willing to answer questions without a lawyer present. No
promises or threats have been made to me, and no pressure
or force of any kind has been used against me.

/s/ Michael Rodgers.

(ECF No. 114, ex. 4.) Shortly thereafter, Agent White asked Rodgers
if the officers could search the house and if he would sign a
Consent to Search form. Rodgers signed the Consent to Search form
at 12:21 p.m. (ECF No. 114, ex. 5.) After obtaining verbal and
written consent for the search, White entered the house to
participate in the search.[6] Rodgers waited outside with Agent Ryan
and one of the investigators during the search. The search yielded
a rifle, ammunition, and numerous marijuana plants scattered
throughout the property.[7] The officers also apprehended Mashburn,
who was inside the house, during the search.[8]

---

[6]Rodgers disputes that he signed either of these forms before the
search, asserting that he signed the Consent to Search form
immediately before being taken to the Justice Center and that he
signed the Advice of Rights form when he was in the Justice Center
interrogation room. He does not dispute that he gave verbal consent
to Agent White before she entered the house.

[7]Agent White testified that she was the officer who recovered the
gun and the ammunition.

[8]Rodgers testified that Mashburn was apprehended and taken out of
the house while Rodgers was still being introduced to Agent White.
The court does not find this testimony credible.

- 5 -

After the search, at around 12:51 p.m., White approached Rodgers to ask him questions about the gun and the marijuana plants the officers had recovered. Rodgers admitted that he had borrowed the gun from his brother, that the ammunition belonged to his girlfriend, and that he had been growing marijuana plants at the residence for several months. Agent White placed him in custody and transported him to the Justice Center. At the Justice Center, Agent White again interviewed him about the gun and the marijuana. She asked him if he lived at 2267 Curve Nankipoo Road. Rodgers responded that he had lived there part-time with his girlfriend but that he lived primarily at his mother's house. Agent White did not remind him of his <u>Miranda</u> rights until three minutes into the conversation, at which point she said: "I forgot to mention, you're still, I mean we read you your rights earlier, I just want to remind you, you're still . . ." During this interview, Rodgers again admitted that his brother had lent him the gun, that he was growing marijuana in the house, and that he had been growing marijuana in the house for at least six months. Rodgers testified that he was not coerced into making these statements but that he felt as if his nephew would be charged if he did not claim ownership of the contraband.[9]

---

[9]After reviewing audio recordings of Rodgers's two interviews with Agent White, the undersigned finds that there is no evidence suggesting that the officers made any representations that his nephew would be charged. (ECF No. 114, ex. 8.)

On April 25, 2019, Rodgers was indicted by a grand jury on one count of possessing a firearm after having been previously convicted of a felony in violation of 18 U.S.C. § 922(g)(1), one count of possessing ammunition after having been previously convicted of a felony in violation of 18 U.S.C. § 922(g)(1), and one count of possessing marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1.) On November 21, 2019, Rodgers was indicted on an additional charge of possessing a firearm in furtherance of a crime of drug trafficking in violation of 18 U.S.C. § 924(c). (ECF No. 40.)

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  The Search

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A warrantless search or seizure is 'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" United States v. Roark, 36 F. 3d 14, 17 (6th Cir. 1994) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Two exceptions are relevant here: consent and the probationer exception. See United States v. Purcell, 526 F.3d 953, 960 (6th Cir. 1994) (quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996)) ("'An officer with consent needs neither a warrant nor probable cause to

conduct a constitutional search.'"); United States v. Tucker, 795 F. App'x 963, 965 (6th Cir. 2020) (quoting United States v. Tessier, 814 F.3d 432, 433-34 (6th Cir. 2016) and citing United States v. Knights, 534 U.S. 112, 119 (2001)) ("[W]e answered yes to the question '[w]hether, under the Fourth Amendment, a probationer whose probation order contains a search condition may be subjected to a search in the absence of reasonable suspicion.'").

1.   Consent to Search

Rodgers gave consent for the officers to search the Curve Nankipoo residence. A warrantless search of a dwelling may be conducted "with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006); see also Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("[I]t is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). Once given, "[i]t is well-settled that 'the consenting party . . . at any moment may retract his consent.'" United States v. Buckingham, 433 F.3d 508, 513 (6th Cir. 2006) (quoting Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999)). The Sixth Circuit recognizes that police officers can approach a suspect's home without a warrant for a "knock and talk" investigation, though they cannot enter the home without consent. United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005)

(collecting cases recognizing interviews at a suspect's doorstep "as a legitimate investigative technique").

Such consent must be voluntary and freely given. United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" Id. (quoting United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977)). "The government is required to show something more than 'mere acquiescence' on the part of the defendant." United States v. Holland, 522 F. App'x 265, 274 (6th Cir. 2013) (quoting United States v. Canipe, 569 F.3d 597, 603 (6th Cir. 2009)). "'[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" Moon, 513 F.3d at 537 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). Relevant circumstances include the age, intelligence, and education of the individual, whether the individual understood that he had the right to refuse consent, the use of coercive conduct by police, and whether the individual knew his constitutional rights. United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999); see also United States v. Frost, 521 F. App'x 484, 488-89 (6th Cir. 2013); United States v. Ables, 280 F. App'x 513, 516-17 (6th Cir. 2008). Police officers are not required to tell defendants that they have

a right to decline giving consent but doing so is further evidence that consent was voluntarily given. United States v. Gossett, 600 F. App'x 330, 335 (6th Cir. 2015). "The burden of proving that a search was voluntary is on the government . . . and 'must be proved by clear and positive testimony.'" Moon, 513 F.3d at 537 (quoting United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978)). "The government's showing must satisfy the preponderance standard." Holland, 522 F. App'x at 274 (citing Worley, 193 F.3d at 385).

Based on the credible testimony of Investigator Jones and Agent White, the undersigned finds that Rodgers gave the officers consent to search the home. Throughout the encounter, no weapons were drawn apart from a taser that was quickly holstered after Rodgers's dog was put in a kennel. In under five minutes, Investigator Jones introduced Rodgers to Agent White, Rodgers gave verbal consent for the search, and Rodgers signed the consent to search form. Rodgers cooperated with the officers from the outset and his conversations with Agent White and Investigator Jones were calm and non-confrontational throughout. See United States v. Cathey, No. 13-20255-STA-tmp, 2014 WL 462992, at *6 (W.D. Tenn. Feb. 5, 2014) (finding consent valid where the officers did not brandish any weapons and the defendant "remained calm and cooperative," volunteered that he was possessing drugs, and was not arrested until after the search). Additionally, Rodgers was

- 10 -

familiar with Investigator Jones and "has prior criminal convictions, therefore he is no stranger to the police or the criminal justice system." Canipe, 569 F.3d at 604 (quoting United States v. Canipe, No. 2:07-CR-64, 2007 WL 3181135, at *3 n.2 (E.D. Tenn. Oct. 26, 2007)). There is no evidence that any of the officers acted in a coercive or threatening manner to obtain Rodgers's consent or that Rodgers was under duress.[10] Based on the totality of the circumstances, the undersigned submits that Rodgers gave valid and voluntary consent to the search of his home.

2.    The Probationer Exception

In addition to consent, the search was lawful because Rodgers was under a state court probation order that authorized searches of his home. "[T]he warrant and probable cause requirements generally do not apply to searches of parolees, probationers, or their residences." United States v. Patterson, No. 2:10-cr-20317-cgc, 2012 WL 3100400, at *4 (W.D. Tenn. Mar. 30, 2012) (citing Samson v. California, 547 U.S. 843, 857 (2006)). "Probationers

---

[10]Rodgers relies on United States v. Chambers and non-binding authority from other circuits to suggest that his consent was involuntary because it occurred after the search had begun. 395 F.3d 563, 569-70 (6th Cir. 2005), abrogated on other grounds by Kentucky v. King, 563 U.S. 452 (2011). In Chambers, however, the defendant did not give consent until after the search was completed and he had been effectively placed under arrest. Id. This is not applicable here, as Agent White received Rodgers's consent for the search immediately upon speaking to him and she participated in the search. Indeed, she was the officer who discovered some of the contraband in the house.

have fewer expectations of privacy than free citizens and parolees have still 'fewer expectations of privacy than probationers.'" United States v. Smith, 26 F.3d 306, 308-09 (6th Cir. 2008) (quoting Samson, 547 U.S. at 850 and citing Knights, 534 U.S. at 119). Where a probation order contains a warrantless search provision, courts in the Sixth Circuit will uphold a warrantless search of a probationer's home if it is reasonable based on the totality of the circumstances. See Tessier, 814 F.3d at 433; United States v. Fletcher, No. 19-3153, 2020 WL 6268635, at *6 (6th Cir. Oct. 26, 2020) (citing Knights, 534 U.S. at 119) (limiting the Tessier holding to probation orders that "'clearly express[] the search condition' so that the probationer '[is] unambiguously informed'" of his reduced expectation of privacy). This is because a probation condition can "significantly diminish[] [a defendant's] reasonable expectation of privacy" while simultaneously bolstering "the state's interest in preventing recidivism." Knights, 534 U.S. at 120; Tucker, 795 F. App'x at 965. In assessing reasonableness, the Supreme Court has instructed courts to weigh "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 119 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). States have an increased interest in preventing probationers from committing crimes because

probationers are "more likely to engage in criminal conduct than an ordinary member of the community" and because they "have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation." Id. at 120.

The Sixth Circuit has held that police officers can conduct a warrantless search of a residence that is not listed on a probation order where there is probable cause to believe that the probationer lives there.[11] United States v. Damron, No. 18-3129, 2018 WL 7253960, at *4 (6th Cir. Sept. 10, 2018) (citing United States v. Payne, 588 F. App'x 427, 433-34 (6th Cir. 2014)) ("[W]e have upheld a warrantless search of a third party's residence where officers had probable cause to believe that a probationer resided there."); see also Thornton v. Lund, 538 F. Supp. 2d 1053, 1057-58 (E.D. Wis. 2008) (citing Motley v. Parks, 432 F.3d 1072, 1078 (9th Cir. 2005) (en banc), overruled on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012) (per curium) and

---

[11]The Sixth Circuit has left open the question of whether police officers need reasonable suspicion or probable cause to believe that a probationer lives in a residence to conduct a warrantless search. Payne, 588 F. App'x at 433 ("Because we agree that probable cause existed, it is not necessary to decide whether reasonable suspicion connecting a parolee or probationer to the premises to be searched would be sufficient under the balancing called for by Knights."). Under either standard, the undersigned finds that the officers were justified in their belief that Rogers lived at the Curve Nankipoo residence.

Moore v. Vega, 371 F.3d 110, 116 (2d Cir. 2004)) ("[I]f officials reasonably believe that a parolee or probationer lives at a particular house, courts analyze the search as if the parolee or probationer in fact lived there."). For example, in United States v. Damron, the Sixth Circuit held that parole officers did not need a warrant to search a home that was not listed on the defendant's probation order and belonged to a third party because

> prior to the search, Hill's parents had informed Officer Barr that Damron was living with their daughter in Carroll County. Damron himself acknowledged that he was residing at Hill's house when he registered her address as his own with the Harrison County Sheriff's Office. Finally, the APA officers confirmed that Damron was present at Hill's house when he answered Hill's door on the day in question. The seized items were taken from a bedroom closet and a living room shelf, both areas that would be searched in any attempt to confirm where Damron resided.

2018 WL 7253960, at *4. As such, the court held that Damron's probation order extended to Hill's house because the officers "had probable cause to believe that Damron resided at Hill's house at the time they entered." Id.

Here, Rodgers's probation order included a clause allowing for warrantless searches of his person, property, and residence by law enforcement officers at any time. While the probation order listed Rodgers's address as 112 Halliburton Street, the officers had ample reason to believe that he was residing at the Curve Nankipoo residence. First, the officers were responding to a tip alleging that he was growing marijuana at the 2267 Curve Nankipoo

- 14 -

residence and that he kept guns at the house. Second, Agent White spoke with Rodgers's probation officer before going to the residence. Additionally, several of the officers were familiar with Rodgers from his prior interactions with the police and they believed that he lived at the residence. Further, when the police arrived at the house, Rodgers came out to meet them on his own volition. Finally, Rodgers told White during the Justice Center interview that, though he was currently staying at the Halliburton residence, he had lived at the 2267 Curve Nankipoo Road residence during his probation. See id.; Payne, 588 F. App'x at 433-34. Thus, the officers had probable cause to believe that Rodgers was residing at the Curve Nankipoo residence when they conducted the search. See Damron, 2018 WL 7253960, at *4

Further, the undersigned submits that the express terms of the probation order "unambiguously informed" Rodgers that the Curve Nankipoo residence might be subject to a warrantless search, thereby reducing his reasonable expectation of privacy in the house. Fletcher, 2020 WL 6268635, at *6 (quoting Knights, 534 U.S. at 119). Rodgers's probation order contained the exact same condition that the Sixth Circuit in United States v. Tessier held enabled police officers to search a probationer's residence without a warrant or reasonable suspicion. 814 F.3d at 433 (holding that a defendant was subject to warrantless and suspicionless searches where his probation order read "I agree to a search,

without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time"). Rodgers was on probation after being convicted of growing marijuana and was suspected of, again, growing marijuana. This gave the officers a strong interest in preventing Rodgers from violating his probation order and in preventing recidivism. See Knights, 534 U.S. at 120. As such, the undersigned submits that the "the government's interest in preventing [Rodgers] from committing . . . another probation violation outweighed his diminished interest in privacy – which is to say the search was reasonable." Tucker, 795 F. App'x at 965.

**B.    _Miranda_ Challenges**

As articulated by the Supreme Court in Miranda v. Arizona, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Since Miranda, the Supreme Court has summarized its central principle as follows: "if the police take a suspect into custody and then ask him questions without informing him of [his] rights . . . his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 428 (1984).

1.    Rodgers's Pre-_Miranda_ Statements

- 16 -

Rodgers first seeks to suppress his initial statement to
Investigator Jones that he was "doing the same thing as last time."
It is undisputed that Rodgers was not read his Miranda rights
before making this statement. However, the court finds that Rodgers
was not in custody for purposes of Miranda when he made this
statement.

"In determining whether a defendant was subject to custodial
interrogation we look to the totality of the circumstances 'to
determine how a reasonable man in the suspect's position would
have understood the situation.'" United States v. Swanson, 341
F.3d 524, 528 (6th Cir. 2003) (quoting United States v. Salvo, 133
F.3d 943, 948 (6th Cir. 1998)). "[T]he ultimate inquiry is simply
whether there is a formal arrest or restraint on freedom of
movement of the degree associated with a formal arrest." United
States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (internal
citation and quotation omitted). However, "[n]ot all restraints on
freedom of movement amount to custody for purposes of Miranda."
Howes v. Fields, 565 U.S. 499, 509 (2012). A suspect who does not
feel free to terminate an encounter is only in custody for purposes
of Miranda if "the relevant environment presents the same
inherently coercive pressures as the type of station house
questioning at issue in Miranda." United States v. Howard, 815 F.
App'x 69, 78-79 (6th Cir. 2020) (quoting Fields, 565 U.S. at 509).

The Sixth Circuit has set out four factors to consider when determining if a suspect is in custody: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." United States v. Luck, 852 F.3d 615, 621 (6th Cir. 2017) (quoting United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010)). Further, "an important factor underlying Miranda was the interrogator's goal of 'isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner. . . . These concerns simply do not apply to most in-home interrogations.'" United States v. Panak, 552 F.3d 462, 467 (6th Cir. 2009) (quoting Beckwith v. United States, 425 U.S. 341, 346 & n.7 (1976)).

Rodgers spoke with Investigator Jones in his front yard shortly after the police officers arrived at the scene. This is "a fact that typically weighs against being 'in custody.'" See Luck, 852 F.3d at 621 (quoting Panak, 552 F.3d at 466); see also United States v. Slone, No. 12-5-ART-(4), 2013 WL 3799419, at *4 (E.D. Ky. July 19, 2013). The conversation lasted only a few minutes and was not a lengthy interrogation. Rodgers immediately recognized Investigator Jones and, after being told why the police had come to the house, calmly stated that he was doing the same thing that Investigator Jones had previously arrested him for and pointed to

where some of the marijuana plants were growing. See United States v. Abdi, No. 19-1782, 2020 WL 5542884, at *5 (6th Cir. Sept. 16, 2020) (defendant not in custody for non-accusatory and routine questions posed "in the first minute of the interaction"); Luck, 852 F.3d at 621 (an hour-long interrogation was "not lengthy by our standards"). Rodgers was not handcuffed or restrained, and both Rodgers and Investigator Jones were calm throughout the conversation.[12] See Panak, 552 F.3d at 467 (holding that the fact that the officers did not handcuff or restrain a suspect weighed against finding that a suspect was in custody). Thus, the court finds that Rodgers's conversation with Investigator Jones did not rise to "the level [of restraint] associated with 'formal arrest or a coercive context tantamount to custody.'" United States v. Hardy, No. 17-cr-20378-JTF-tmp, 2018 WL 7348860, at *3 (W.D. Tenn. Nov. 21, 2018) (quoting Swanson, 341 F.3d at 529).

   2.   Rodgers's Post-*Miranda* Statements at the Residence

   Next, Rodgers seeks to suppress his statements made to Agent White at the residence. After Miranda warnings are given, the

---

[12]Rodgers argues that he was in custody because the police cars were parked in a manner that would have prevented him from leaving the house except by driving across the lawn. However, Rodgers did not try to terminate the encounter by going back inside and, in any event, whether an individual is free to leave is "only a necessary and not a sufficient condition for Miranda custody." United States v. Howard, 815 F. App'x 69, 78-79 (6th Cir. 2020) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)).

primary consideration before the court is whether a defendant voluntarily, knowingly, and intelligently waived his rights. United States v. Al-Cholan, 610 F.3d 945, 954 (6th Cir. 2010) (citing Colorado v. Spring, 479 U.S. 564, 572 (1987)). "To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether [defendant] understood his right to remain silent and to await counsel." Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005). Determining if a defendant understood his Miranda rights is a question of "whether he knew that he could 'choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" United States v. Lawrence, 735 F.3d 385, 437 (6th Cir. 2013) (quoting Garner v. Mitchell, 557 F.3d 257, 261 (6th Cir. 2009)). A Miranda waiver is not voluntary if it is the product of coercion. United States v. Binford, 818 F.3d 261, 271 (6th Cir. 2016). A waiver is coerced if "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; [and] (iii) . . . the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." Id. (quoting United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999)).

A defendant can waive his Miranda rights either expressly or implicitly. See United States v. Miggins, 302 F.3d 384, 397 (6th

Cir. 2002). "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2260 (2010); <u>see also</u> <u>Lawrence</u>, 735 F.3d at 438 (holding that a defendant "chose to waive [his rights] by speaking to the officer" after being read his <u>Miranda</u> rights and not showing a reluctance to talk or invoke his rights). The government bears the burden of proof and must show by a preponderance of the evidence that a <u>Miranda</u> waiver was knowing and voluntary. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).

As the undersigned found in the Proposed Findings of Fact, Agent White did not ask Rodgers any questions at the residence until after she read him his rights and he signed the Advice of Rights form. <u>See</u> <u>United States v. Lilley</u>, No. 17-20023-SHM-tmp, 2014 WL 6982460, at *4 (W.D. Tenn. Nov. 14, 2014) (holding that a defendant's signature on an Advice of Rights form "serves as an explicit waiver of his rights"). This is an explicit waiver of his Fifth Amendment rights.[13]

---

[13]Rodgers argues that Agent White's <u>Miranda</u> warnings at this stage in the conversation were ineffective as "midstream <u>Miranda</u>" warnings because Rodgers had already confessed to Investigator Jones. <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. 600, 604, 615 (2004) (holding that a "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with <u>Miranda</u>'s constitutional requirement"); <u>United States v. Ray</u>, 803 F.3d 244, 267-68 (6th Cir. 2015) (quoting <u>Seibert</u>, 542 U.S. at

3.    Rodgers's Statements at the Justice Center

Further, the undersigned submits that the Miranda warnings Agent White gave Rodgers at the residence were still in effect when she questioned him at the Justice Center. Where there is a delay between when Miranda warnings are given and when the defendant is interrogated, courts in the Sixth Circuit use a totality of the circumstances test to determine if the circumstances have seriously changed such that the defendant must be re-read his Miranda rights. Treesh v. Bagley, 612 F.3d 424, 431-32 (6th Cir. 2010) (citing Wyrick v. Fields, 459 U.S. 42, 47 (1982) and United States v. Weekley, 130 F.3d 747, 751-52 (6th Cir. 1997)). In making this determination, courts in the Sixth Circuit consider several factors, such as:

> the amount of time that has elapsed between the warning and the statements, whether there were subsequent reminders or re-warnings after the initial reading and waiver, whether the interrogation [occurred] in the same or a different location than the warning, whether the defendant initiated the interview, and the substance of the Mirandized interrogation compared to subsequent interrogations.

---

616) ("[T]he admissibility of statements given after midstream Miranda warnings hinges on whether 'a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the Miranda warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'"). This argument is rendered moot by the undersigned's earlier finding that Rodgers was not in custody prior to receiving his Miranda warnings. See Hoffner v. Bradshaw, 622 F.3d 487, 512 (6th Cir. 2010) ("[B]ecause none of the [earlier] statements violated Miranda on its own, none of them can taint any later statements.").

United States v. Morris, No. 2:13-cr-00086(1)-GLF, 2013 WL 3867836, at *3 (S.D. Ohio July 25, 2013) (citations omitted).

The undersigned submits that Agent White was not required to provide Rodgers with fresh Miranda warnings at the Justice Center. See Treesh, 612 F.3d at 432 (citing Wyrick, 459 U.S. at 47) (holding that Miranda warnings given at the scene of an arrest were effective when a defendant was interrogated two hours later and after having been transported between two locations because the defendant was still aware of his rights); see also United States v. McKinney, No. 1:17-cr-133-CLC-SKL, 2018 WL 4242410, at *6-8 (E.D. Tenn. Sept. 6, 2018) (fresh Miranda warnings unnecessary where defendant was read his rights when he was arrested and was interrogated by his arresting officer at the jail three hours later). Here, the circumstances had not substantially changed between when Agent White gave Rodgers his Miranda warnings and when she interviewed him at the Justice Center. See Treesh, 612 F.3d at 432. Only four hours had passed since Rodgers had signed the Advice of Rights form. Agent White interviewed Rodgers both times. Further, the substance of both interviews was virtually identical and, early on during the interview, Agent White reminded Rodgers that he had already been read his rights. Moreover, Agent White did not act in a coercive manner in conducting the interview

at the Justice Center.[14] Thus, Rodgers's waiver of his <u>Miranda</u>
rights was still valid.

### III. RECOMMENDATION

For the above reasons, it is recommended that Rodgers's Motion
to Suppress be denied.

Respectively submitted,


s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

December 21, 2020
Date


### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN
FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.
28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN
(14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND
ANY FURTHER APPEAL.**

---

[14]While Rodgers alleges that the officers threatened to keep his
nephew in jail unless he confessed, there is no evidence that this
threat occurred and, in any event, he testified that he merely
thought his nephew would be charged if he did not confess. <u>See</u>
<u>Binford</u>, 818 F.3d at 271 (a <u>Miranda</u> waiver is only involuntary for
police coercion if "the police activity was objectively
coercive").

- 24 -